IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.


MICHAEL D. ELLIS,

Plaintiff,

v.

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,

a New Hampshire corporation,

Defendant.

---

## COMPLAINT

---

Plaintiff, Michael D. Ellis, by and through his attorneys, James A. Cederberg and Luke M. Cederberg of Cederberg Law Firm, P.C., hereby submits his Complaint. As grounds therefore, plaintiff states as follows:

### JURISDICTIONAL ALLEGATIONS

1.      Plaintiff, Michael D. Ellis, at all material times, was an employee of Comcast Corporation.

2.      As an employee of Comcast Corporation, the plaintiff Michael D. Elllis was, at all material times, an Employee insured under the policy and a "Covered Person" under Group Disability Income Policy GF3-830-502315-01E issued by the defendant, Liberty Life Assurance Company of Boston (hereinafter "Liberty Life" or "Liberty").

1

3.      The said Group Disability Income Policy is an employee welfare benefit plan governed by the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.

4.      This is a claim for past benefits and for clarification of rights to future benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).

5.      Subject matter jurisdiction in this Court exists pursuant to 29 U.S.C. § 1132(f).

**CLAIM FOR RELIEF**

**(Claim Pursuant to 29 U.S.C. § 1132(a)(1)(B) for Past Benefits Due and for Clarification of Right to Future Benefits, and for Attorneys' Fees and Costs Pursuant to § 1132(g)(1))**

6.      Plaintiff incorporates by reference paragraphs 1 through 5 of his Complaint.

7.      Under the terms of the Policy, Liberty Life had the sole responsibility for approval or disapproval of claims for long term disability benefits under the Policy.

8.      Defendant Liberty Life was therefore an administrator of the Plan with regard to benefits insured under the Policy.

9.      Defendant Liberty Life is a New Hampshire corporation.

10.     Defendant Liberty Life acted or failed to act through its agents, servants or employees.

11.     The Liberty Life insurance policy number GF3-830-502315-01 was a contract of which the plaintiff Michael D. Ellis, also identified in the Liberty Life file as Michael Ellis, was a beneficiary.

12.     The defendant Liberty Life was and is legally required to abide by the terms of the Policy.

13.      Liberty Life was and is obligated to pay benefits, to the extent due to plaintiff under the Policy, out of Liberty Life's own assets or resources.

14.     Liberty Life therefore had and continues to have a conflict between its duty to administer the Policy for the benefit of beneficiaries such as Michael Ellis and its own financial self-interest.

15.     Liberty Life's conflict of interest must be considered by this Court in applying the appropriate standard of review.

16.     The said Policy, at all material times, provided for monthly benefits of 60% of the participant's Basic Monthly Earnings, reduced by Other Income Benefits and Other Income Earnings, if the participant became disabled within the meaning of the Policy.

17.     Michael Ellis's date of birth is September 12, 1958.

18.     The Policy provided that, as long as a beneficiary continues to meet the definition of disability, benefits continue until the beneficiary reaches age 65.

19.     Michael Ellis will reach age 65 on September 12, 2023.

20.     "Disability" or "Disabled", with respect to Long Term Disability, means:
        …

        b. i.    if the Covered Person is eligible for the 12 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, he is unable to perform the Material and Substantial Duties of his Own Occupation; and

        ii.    thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

3

21.     Pursuant to the terms of the Policy:

> "Any Occupation" with respect to Class 4, means any gainful occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.  Gainful occupation means an occupation in which the earnings are:
>
> -   Equal to or greater than 80% of the Employee's pre-disability income;
> -   Less than 80% of the Employee's average pre-disability income, but higher than the average earnings for the geographic area in which the Employee resides; or
> -   Equal to or greater than the gross benefit.

22.     Pursuant to the terms of the Policy:

> "Material and Substantial Duties" means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

23.     At all material times, Michael Ellis was an employee within Class 4 for purposes of the Liberty Life policy.

24.     At all material times and at the onset of his disability, Michael Ellis was employed as a Senior Systems Architect.

25.     Michael Ellis's job as Senior Systems Architect required multiple tasks and skills, including but not limited to the following:

> 1)     Analyzing product requirements working with Senior Management, Product Management, Product Design, Product Development, Integration Test and Operations;
>
> 2)     Allocating system requirements into individual requirements for new and existing components and interfaces;
>
> 3)     Analyzing feature complexity and time estimates, negotiating with management to determine feature set to be delivered;

4)      Creating detailed architectural documents;

5)      Managing requirements database;

6)      Creating detailed interface documents;

7)      Performing bandwith modeling.

26.    In January of 2012, Michael Ellis became ill with a respiratory infection. The respiratory infection developed into pneumonia.  On or about January 31, 2012, he developed severe chest pain, for which he sought emergency medical attention at Boulder Community Hospital.

27.    While undergoing treatment at Boulder Community Hospital on February 1, 2012, Michael Ellis was administered nitroglycerin.  Shortly thereafter, he suffered sudden cardiac arrest.  His heart stopped beating.  His heart spontaneously recovered its rhythm after a period, according to the hospital monitoring device, of 24 seconds.

28.    The source of the plaintiff's chest pain was identified as pulmonary emboli, or blood clots in his lungs.

29.    Mr. Ellis was admitted to the hospital for further treatment.  He was hospitalized in the Intensive Care Unit for 4 more days.

30.    Mr. Ellis continued to be acutely ill for approximately another three weeks.

31.    As he regained his strength enough to try to resume normal activities, including work, Mr. Ellis found that he was experiencing difficulty concentrating, difficulty remembering things, trouble with multi-tasking, fatigue, and other cognitive difficulties.

32.     Along with the cognitive issues, Mr. Ellis also experienced dizziness, problems with his balance, a feeling that he was "wobbly" and difficulty with his motor skills.

33.     Michael Ellis's deficits and conditions made it impossible for him to perform the duties required by his job.

34.     Michael Ellis was therefore "disabled" within the meaning of the Policy.

35.     The Policy definition of disability changed effective September 1, 2013 as described in paragraph 20, above.

36.     Michael Ellis's conditions continued after September 1, 2013 and still continue.

37.     Michael Ellis's conditions rendered him unable to perform "Any Occupation" within the meaning of the Policy.

38.     Michael Ellis continues to suffer from cognitive and physical conditions that make it impossible for him to work at "Any Occupation" within the meaning of the Policy.

39.      Michael Ellis therefore continued to be disabled under the terms of the Policy after the change of definition in September 2013 and remains disabled within the meaning of the Policy.

40.     Michael Ellis's conditions and resulting disability are likely to be permanent.

41.     Michael Ellis has complied with all terms and conditions of the Policy.

42.     On or about October 17, 2012, Mr. Ellis's claim was approved for

payment of Short Term Disability benefits through the conclusion of the Elimination Period on September 5, 2012, and was referred for analysis of his Long Term Disability claim.

43.    As part of its investigation of the Long Term Disability claim Liberty Life calculated Mr. Ellis's Basic Monthly Earnings to be $14,287.15.

44.    At all material times, Liberty Life knew that Mr. Ellis's gross monthly benefits would be 60% of $14,287.15, calculating to $8,572.29.

45.    At all material times, Liberty Life knew that, if Mr. Ellis continued to be disabled, Long Term Disability benefits would continue until September 11, 2023, the day before Mr. Ellis reaches age 65.

46.    In support of his claim for Long Term Disability benefits, the plaintiff submitted medical records and a Neuropsychological Evaluation Report from Dennis J. Helffenstein, Ph.D. dated November 10, 2012.

47.    On November 21, 2012, Liberty Life referred the claim to its Special Investigations Unit for clandestine surveillance of Michael Ellis by a vendor.

48.    Clandestine surveillance of Michael Ellis was conducted on December 6, 7, 8 of 2012.  In three days of surveillance, he was observed outside of his home on one occasion, being driven by someone else and walking slowly using a cane.

49.    On January 11, 2013, Liberty Life's claims adjuster, Shanon Wright, recommended that the claim be approved under a reservation of rights while being reviewed to determine whether initial liability would be accepted or not, and that an initial determination would be made once Liberty Life's neuropsychological review is completed.

50.     The file was referred to John A. Crouch, Ph.D., Board Certified Clinical Psychologist.

51.     Dr. Crouch was, at all material times, an in-house consulting neuropsychologist for Liberty Life.

52.     Dr. Crouch advised the claims personnel that he wanted to review Dr. Helffenstein's raw data.

53.     Liberty Life made arrangements for Dr. Helffenstein to send his raw data to Dr. Crouch, and Dr. Crouch received the raw data.

54.     Dr. John A. Crouch provided his report, captioned "Clinical Case Review – Addendum" dated April 4, 2013.  Dr. Crouch informed the Liberty Life claim handler, as follows:

> Additional medical records, including raw test data from Dr. Helffenstein's 11/10/12 Neuropsychological Evaluation, provide reasonable support for significant neurocognitive impairment from 3/1/12 secondary to Cognitive Disorder NOS (294.9).  In particular, various statistically and clinically significant impairments are revealed across multiple neurocognitive domains including learning/memory, attention/concentration, and processing speed. Overall neuropsychological functioning is also within the clinical impaired range.  _Of note, multiple measures of response bias were administered and yielded Normal findings, suggesting that the claimant's impairments are valid/reliable_.

> A variety of significant restrictions and limitations would likely result from this claimant's impairment including difficulty with concentration, persistence, pace, and adaption.  Given the reportedly cognitively demanding nature of the claimant's job, he would likely be precluded from performing the usual duties of his job, regardless of accommodations provided.

(Emphasis Added).

55.     Dr. Crouch also stated in his April 4, 2013 report:

> 11/10/12 Neuropsychological Evaluation Raw Data from Dennis

> Helffenstein, Ph.D. Raw test data were provided by AP for review. <u>Evaluation instruments appear appropriately administered, scored and normed. Scores from response bias measures are WNL, suggesting that the neurocognitive test findings are valid/reliable.</u>

(Emphasis Added).

56.     Dr. Crouch also noted, based on his review and a review by a Liberty Life consulting internist, that it was highly unlikely that the 24-second period of heart stoppage on February 1, 2012 is the sole cause of Mr. Ellis's functional difficulties.

57.     Defendant, Liberty Life, at all material times, knew that under the terms of its policy benefits were payable for disability "as a result of injury or sickness", and that proof of a specific cause or mechanism of the injury was not required.

58.     In his April 4, 2013 report to Liberty Life, Dr. Crouch also stated:

> Although findings from measures of emotional/psychological functioning suggest a possible psychiatric contribution (e.g. depression) to his difficulties, other possible contributors remain unclear.

59.     Liberty Life knew, at all material times, that Michael Ellis had suffered a decline in cognitive functioning and had been unable to continue working, that he was unable to earn the substantial salary to which he had become accustomed, and that he walked slowly and could no longer pursue his hobby of participating in triathlons.

60.     Liberty Life knew, at all material times, that depression was a common secondary effect from the changes such as Mr. Ellis had experienced in 2012 and 2013.

61.     On April 5, 2013, citing Dr. Crouch's April 4, 2013 report, the claim

handler recommended that Liberty Life "accept liability for the claim under dual physical and M/N diagnoses, and stated:" M/N ["Mental/Nervous"] limitation to be applied.

62.     In her recommendation of April 5, 2013, the claim handler stated, as the only citied basis of application of the "M/N limitation", that: "Etiology of cognitive impairment is unclear and psychiatric component cannot be ruled out.

(Emphasis Added).

63.     On April 5, 2013, on behalf of Liberty Life, claims manager Barbara Durling approved the claim, stating:

> "Given CP [Consulting Physician] reviews and uncertainty of origin of cognitive impairment, agree with approval of LTD under dual Dx [diagnosis] – cognitive impairment supported and need to flush out origin…Claim remains set up primarily as physical since cognitive deficit origin is unknown."

64.     On April 11, 2013, the claim handler, Shanon Wright, sent a letter to Michael Ellis stating:

> The Neuropsychologist that reviewed your file opined that from a cognitive perspective you are impaired from performing your occupation at this time.  However, the etiology of your cognitive impairments remains unclear.   Both the Internist and the Neuropsychologist have concluded that it is highly unlikely that the reported twenty-four second period of asystole on February 1, 2013 would be the cause of your cognitive complaints.   The reviewing Neuropsychologist further opines that the test results of the Neuropsychological evaluation you completed indicates a possible psychiatric component that may be contributing to your deficits.
>
> Although the etiology of your cognitive deficits is unclear at this time, we have determined you are disabled from cognitive deficits and are eligible to receive LTD benefits.
>
> Since it has been indicated that your disability is also related to a Mental Nervous condition, your claim is also subject to the

Mental/Illness provision in the policy…

65.     The M/N clause in the policy, referred to as the "Mental/Illness provision" in the April 11, 2013 letter, provides in pertinent part:

> Mental Illness, Substance Abuse and/or Non-Verifiable Symptoms Limitation-Applicable to Class 4
>
> The benefit for Disability due to Mental Illness, Substance Abuse, and/or Non-Verifiable Symptoms will not exceed a period of 24 months of Monthly Benefit payments while the Covered Person is insured under this policy.

66.     As defined in the policy, "'Mental Illness' means a psychiatric or psychological condition, <u>without demonstrable organic origin</u>, classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM)…" (Emphasis Added).

67.     Liberty Life knew on April 11, 2013 and at all material times that Michael Ellis did not suffer from a mental illness as defined in the policy.

68.     "Uncertainty" over other factors besides structural damage that may accompany and contribute to deteriorated cognitive performance did not constitute a reasonable basis for classifying Mr. Ellis disability as coming within the "Mental Illness" limitation.

69.     Since the term "Mental Illness" by definition means "without demonstrable organic origin", the finding of a physical basis, but nevertheless classifying the disability as "Mental/Nervous" is inconsistent with the policy and without a reasonable basis.

70.     Claiming that Mr. Ellis's disability was subject to the mental illness limitation was a pretense and an excuse to attempt to limit the period that

benefits are payable in this large LTD claim, and was therefore arbitrary and capricious.  It shows a predisposition by Liberty Life to find some way to deny the claim.

71.     Promptly after approving LTD benefits, Liberty Life required Mr. Ellis to apply to the Social Security Administration for Social Security Disability benefits.

72.     Liberty Life referred Mr. Ellis to a vendor, Doherty and Associates, for the purpose of pursuing a Social Security Disability claim.

73.     The Policy provided that Social Security Disability Income benefits are "Other Income" which reduces the amount of payments required under the Plan and policy.

74.     Defendant also knew that an award of Social Security Disability Income benefits required that a claimant meet the definition of disability set out in paragraph 75, below.

75.     Under the applicable provisions of the Social Security Act, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

76.     Defendant, by requiring and sponsoring Michael Ellis's application for Social Security Disability Income benefits, represented to the United States government that Michael Ellis is in fact totally disabled.

77.     On or about December 13, 2013, as a result of the application for Social Security Disability benefits compelled by Liberty Life, the Social Security

Administration found that Michael Ellis became disabled under Social Security rules on March 1, 2012, and awarded Social Security Disability Income benefits retroactive to that date and continuing at $2,588.00 per month plus cost-of-living adjustments.

78.     Liberty Life demanded reimbursement of the Social Security Disability Income benefits and, in response, Michael Ellis paid Liberty Life $31,289.07.

79.     Liberty Life would be entitled to continue to offset the Social Security Disability Income benefits as long as Liberty paid LTD benefits to Michael Ellis.

80.     Liberty Life received substantial benefit from the Social Security Administration based on its vendor's representations to the United States Government that Michael Ellis was disabled, while at the same time denying that Mr. Ellis was disabled.

81.     The definition of disability for purposes of the Liberty Life policy is far less stringent than the definition of disability under which the Social Security Administration determined that Mr. Ellis is disabled.

82.     By taking diametrically inconsistent positions with Mr. Ellis and the United States Government, each with the purpose of serving Liberty Life's financial self-interest, Liberty acted disingenuously and in an arbitrary and capricious manner.

83.     On or before June 28, 2013, Liberty Life received medical records that included physical therapy records from Boulder Community Hospital Mapleton Rehabilitation Center, including a discharge summary dated 12/7/12 noting that Mr. Ellis was still having some mild clonus and difficulty with smooth recruitment of muscle and balance of agonist and antagonist.

84.     These physical therapy notes were consistent with other clinical records in Liberty's possession and with observations of Mr. Ellis obtained through clandestine surveillance ordered by Liberty Life.

85.     The significance of the physical manifestations of neurological damage in Michael Ellis was and is that it corroborates the occurrence of a major neurological insult at the same time as the inception of his complaints of cognitive deficits.

86.     Liberty Life repeatedly, in its claim notes and correspondence, dismissed Mr. Ellis's neurological motor impairments by stating that these motor dysfunctions did not render him disabled.

87.     Liberty Life, its claim handling personnel, claim managers, and physician consultants ignored the obvious and broader significance that the motor deficits were compelling evidence of an insult to Mr. Ellis's brain that corresponded with the onset of his cognitive deficits.

88.     Liberty Life's disregard of the significance of Mr. Ellis's motor deficits was arbitrary and capricious, and caused its decision to lack a reasonable basis.

89.     In July of 2013, Liberty Life ordered clandestine surveillance of Michael Ellis for a second time.

90.     Clandestine surveillance of Mr. Ellis was conducted for three days on August 8, 9 and 10, 2013.   No activity was observed in three days of surveillance.

91.     As of August 29, 2013, Liberty Life's claims personnel continued to discuss sending the file back to their psychologist consultant to discuss whether

14

an independent psychological examination was appropriate "to assess possible psych component that is impacting cognitive complaints." They decided to consult again with Dr. Crouch for help to "assess the next type of (medical) review for CID [Change in Definition] investigation".

92.     On September 10 or 11, 2013, Liberty claims personnel consulted with an unidentified consulting psychologist who recommended that the claim be referred back to Dr. Crouch for review and to outline questions for neuropsych testing if warranted.

93.     On September 12, 2013, claims manager Trish Brewster approved the claim for payment under the change in definition to "Any Occupation" under a reservation of rights pending additional reviews. The stated purpose of the reviews was: COG (cognitive) impairments/psych impairments need to be determined based on info received."

94.     In September of 2013, the claim was again referred by Liberty to Dr. Crouch for review.

95.     Dr. Crouch issued a report captioned Clinical Case Review – Addendum dated 9/17/2013. In that report, Dr. Crouch responded to the question:

> "Please provide an updated assessment of this claim to determine if claimant could perform alternate occupations:"

Dr. Crouch responded as follows:

> Consistent with this reviewer's most recent (4/4/13) report, additional medical records provide reasonable support for significant impairment from 3/1/12 secondary to Cognitive Disorder NOS (294.9). Again, a variety of significant restrictions and limitations would likely result from this claimant's impairment including difficulty with concentration, persistence, pace and adaptation. Given the reportedly cognitively demanding nature of

the claimant's job, he would likely be precluded from performing the usual duties of his job, regardless of the accommodations provided.

In this reviewer's opinion, based on available information, it is unlikely that the claimant could perform the job duties of alternate occupations comparable to his prior job.

96.    In his 9/17/2013 report, Dr. Crouch also answered the question:

Please determine if an independent Neuropsychological Evaluation should be performed.  If so, please provide an outline of suggested tests and questions for this examination.

Dr. Crouch's response stated that an independent Neuropsychologist Evaluation

should include, among other items, the following:

Clinical Interview: Obtain background information regarding the claimant's presenting problems and various aspects of his history. This should include any and all aspects of the claimant's background that are pertinent to his reported complaints or condition.

Current Complaints: Provide a review of the claimant's current complaints.   In particular, provide a review of his physical, cognitive, and emotional/psychological issues.

Record Review

Collateral Interview: If possible, obtain information from a collateral source that has information regarding his functioning prior and subsequent to the onset of his reported impairment.

Behavioral Observations: In addition to typical behavioral observations, if pertinent, provide a review of the claimant's fatigue and pain level/behaviors observed during the assessment.

Dr. Crouch's response on 9/17/13 listing testing that should be included also contained a section captioned "Test Selection", which stated in part:

Test Selection: If possible, the evaluation should include standardized test measures of the following functional domains:

Response Bias/Effort (at least two formal measures of cognitive symptom validity – which have been demonstrated to have

adequate psychometric properties [eg. Word Memory Test, Test of Memory Malingering, Validity Indicator Profile, etc.] – must be included in the evaluation).

97.    Dr. Crouch's specifications for an adequate battery of test effort validity indicators did not require administration of the Word Memory Test, or WMT, but merely listed this particular test as one of several, at least two of which were necessary.

98.    There was no indication that Dr. Crouch or Liberty considered administration of the Word Memory Test (WMT) to be essential or a <u>sine</u> <u>qua</u> <u>non</u> of valid testing.

99.    In September and October of 2013, Liberty required Michael Ellis to undergo neuropsychological evaluation by a neuropsychologist of Liberty's choice, Bob L. Gant, Ph.D.

100.    Dr. Gant, along with staff members under his supervision, performed neuropsychological testing of Mr. Ellis on October 25, 2013 and October 31, 2013.

101.    Dr. Gant issued his Neuropsychological Evaluation report dated November 20, 2013.  The basic conclusion of Dr. Gant was that the test results obtained by Dr. Gant were invalid and did not provide valid/reliable evidence of cognitive impairment.  Dr. Gant stated:

> *It is unlikely that the patient provided valid effort during this examination.  Evidence of symptom exaggeration and suboptimal effort was identified.  The probability that the patient provided suboptimal performance during this examination is high.  It is reasonable to suggest that this may be related to the patient's desire to obtain disability benefits.*

102.   Dr. Gant's report did not state any opinion whether or not Mr. Ellis is actually disabled.

103.   Rather, the substance of Dr. Gant's report is that the results obtained in his testing did not provide valid evidence of cognitive impairment.

104.   Dr. Gant's examination, discussion and conclusions did not discuss or consider other evidence of Mr. Ellis's cognitive impairment beyond neuropsychological testing.   Other evidence of cognitive impairment and disability not addressed by Dr. Gant include, but are not limited to:

   a.) Clinical observations by Mr. Ellis' physician, Daniel Hadley, M.D.;
   b.) Clinical observations by Mr. Ellis' consulting neurologist, Dr. Alan Zacharias;
   c.) Clinical observations and assessments by the treating cognitive therapists at Boulder Community Hospital over the course of dozens of visits;
   d.) Accompanying physical neurological symptoms and findings documented by physical therapists at Boulder Community Hospital and confirmed by clandestine surveillance of Mr. Ellis conducted by Liberty Mutual's vendor;

105.   All of the evidence listed in the preceding paragraph was known to Liberty at the time of Dr. Gant's evaluation.

106.   All of the evidence listed in paragraph 104 was known or should have been known to Dr. Gant at the time of his evaluation of Mr. Ellis;

107.   Dr. Gant's evaluation of Mr. Ellis failed to comply with the specifications in paragraph 96, above, provided by Liberty's own consultant, Dr. John Crouch, in several respects as described in the following paragraphs.

108.   There was no discussion of Mr. Ellis's background pertinent to his reported complaints or conditions, especially in view of Dr. Gant's unsupported comments about secondary gain.

109.   There was no discussion of Mr. Ellis's accompanying physical issues.  Dr. Gant included in his report the following:

> "He [Mr. Ellis] reports problems with dizziness and vertigo since the pulmonary embolism described above.  His ambulation was assisted with walking stick.  He reported that he utilized the walking stick because his gait is unstable and "wobbly".  After Mr. Ellis stood up to take a break during testing, he seemed to have difficulty with his balance."…
>
> During tasks that were challenging, Mr. Ellis's hands would start to shake.

110.   No explanation of the relationship or non-relationship of these physical observations to the likelihood of a neurological insult was provided.

111.   Dr. Gant's report also included the following observation concerning physical characteristics:

> Measurement of upper extremity strength displayed moderate deficits bilaterally as measured by grip strength.  His performance on tests in the dominant and nondominant hand Motor and Sensory domains fell below his expected performance level, predominately because of poor motor speed and strength performances.  His abilities for fine motor tasks, including those that require fine motor speed and persistence were moderately impaired.

112.   There is no explanation or discussion of these observations.  It is unclear whether Dr. Gant questions the validity of these measurements based on his general observations of validity indicators.  Dr. Gant fails to reconcile any of the physical observations with his characterization of Mr. Ellis as a malingerer.

113.   There was no collateral information obtained concerning Mr. Ellis's prior and subsequent functioning.  The information that was available from his job descriptions and prior activities and post-disability observations was that he went

from a very high-performing, active individual to rarely leaving the house and having a difficult time walking around when he did.

114.   Behavioral observations were noted in Dr. Gant's report, but disregarded. Dr. Gant observed that "he [Mr. Ellis] was very slow which required asking him to return for additional testing."  This observation is elaborated upon in an internal Liberty email which states: "The claimant is incredibly slow in completing the testing…"

115.   Dr. Gant fails to address the slowness, or its relationship to Mr. Ellis's fatigue, the sequence of the various tests, and how this difficulty was considered or ignored in his speculation about the significance of Mr. Ellis's answers on the validity tests.

116.   Dr. Gant's report provides no indication that he had knowledge of any of the following facts relevant to the absence of secondary gain on the part of Mr. Ellis from being unable to work and having to rely on disability benefits:

    a.) The amount of Mr. Ellis's basic earnings on which Liberty's long term disability benefits are calculated;

    b.) The percentage of basic earnings that Mr. Ellis would receive in disability benefits;

    c.) The amount of bonuses that Mr. Ellis would receive for working that would not even be included in the disability benefits calculation;

    d.) The amount that Mr. Ellis would receive in stock options if he were working, and that would not be included in the disability benefit calculation;

    e.) Mr. Ellis's extensive professional and career accomplishments that are curtailed due to his disability.

117.    Without this information, Dr. Gant could not make a rational, informed determination of whether Mr. Ellis could logically be motivated by secondary gain if he were to feign a disability.

118.    Dr. Gant's allegation that Mr. Ellis was motivated to try to appear disabled by secondary gain was unfounded, reckless and unreliable.

119.    Dr. Gant stated in his report of 11/20/2013 that: "if additional information is provided for review, including Dr. Helffenstein's raw test data, I would be happy to either confirm or amend my current opinions," but that "raw test data was not provided for review."

120.    Dr. Helffenstein's raw test data had in fact been previously provided to Liberty's own Dr. Crouch in March of 2013 and was cited by Dr. Crouch in his 4/4/13 report to Liberty.

121.    In his review of pertinent medical history, Dr. Gant cites the clinical case review provided by Dr. Crouch before he had access to Dr. Helffenstein's raw data, but makes no mention of the two addenda issued by Dr. Crouch after he studied the raw data but before Dr. Gant's exam.

122.    Liberty referred Dr. Gant's report to Dr. Crouch for review.  Dr. Crouch issued an addendum dated 11/27/2013.  In response, Dr. Crouch recited portions of Dr. Gant's report but provided no commentary or analysis of his own.  Dr. Crouch did not review Dr. Gant's raw data.

123.    On December 10, 2013, Liberty issued a letter authored by Shanon Wright, terminating Mr. Ellis's LTD benefits effective December 4, 2013.

124.   The December 10, 2013 termination letter cited the policy's definition of disability.   The letter also stated:   "In addition to the disability definition noted above, Mr. Ellis's claim for benefits is also subject to the following Policy limitation:" and then recites the "Mental Illness Substance Abuse and/or Non-Verifiable Symptoms Limitation" limiting benefits to no more than 24 months.

125.   Nowhere in the termination letter does it state any basis for how or why the "Mental Illness, etc." limitation would apply to Mr. Ellis.

126.   The stated rationale for termination of the claim makes no reference to the "Mental Illness, etc." limitation.

127.   The December 10, 2013 termination letter cites the Neuropsychological Evaluation by Dr. Gant and quotes from it for approximately two pages.   The quotes include portions discussing the lack of logical causal connections between the 24-second period of heart stoppage and permanent brain injury.

128.   The quotes also include Dr. Gant's comment that he would be happy to review Dr. Helffenstein's raw data "if he could provide" it, despite Liberty knowing that it had this data in Dr. Crouch's possession for eight months.

129.   The December 10, 2013 termination letter also stated:

> With regard to Mr. Ellis's physical complaints of fatigue and dizziness, the examiner was asked to comment regarding "any evidence that secondary issues (e.g. pain, fatigue [physical or cognitive], medication side-effects, substance usage, etc.) affected his ability to complete the evaluation process or his ability to perform cognitive tasks?"  The examiner's response was, "No."

130.   Liberty's December 10, 2013 termination letter's citation of the Gant report also included his insinuations that Mr. Ellis is motivated by secondary gain.

131.   The December 10, 2013 termination letter concluded:

> Given the results of the Neuropsychological Evaluation, Mr. Ellis has not provided continued proof that he continues to satisfy the definition of disability under Any Occupation. The results conclude that Mr. Ellis did not put forth valid and reliable effort during the Neuropsychological Evaluation. Without reliable and valid results from the evaluation, we are unable to assess whether he has cognitive impairment that prevents him from functioning in an occupational capacity. As a Policy under which Mr. Ellis's claim is administered states, without continued proof of disability, a benefit is not payable.

132.   This conclusion is an exaggeration and conflation of the results of Dr. Gant's testing.

133.   Dr. Gant did not address whether or not other proof of Mr. Ellis's cognitive impairment existed.

134.   This conclusion ignores the fact the Michael Ellis had submitted abundant proof of cognitive impairment from the clinical notes of Dr. Hadley, Dr. Zacharias, therapists at Boulder Community Hospital, and the neuropsychological evaluation done by Dr. Helffenstein in 2012. It further ignores the significance of Mr. Ellis's neurologic motor deficits that accompanied his cognitive impairment.

135.   Determination that Mr. Ellis suffers from cognitive impairment was not dependent on Dr. Gant's evaluation.

136.   Because it ignores key facts, the decision by Liberty Life lacked substantial support and was arbitrary and capricious.

137.   As to continuing proof of loss, per the terms of the policy cited by Liberty Life in its termination letter, "Proof of continued loss, continued Disability or Partial Disability, when applicable,… must be given to Liberty within 30 days of the request for such Proof."

138.   Liberty did not request Proof of loss.

139.   Liberty did require Mr. Ellis to appear for the neuropsychological exam by Dr. Gant, which Mr. Ellis did.

140.   Liberty did not request proof of loss or provide Mr. Ellis with an opportunity to provide evidence other than what Liberty's examiner produced.

141.   Liberty therefore violated the terms of its own policy by asserting as grounds for termination that Mr. Ellis had not provided proof of disability.  Such conduct is arbitrary and capricious.

142.   Liberty also stated in its termination letter of 12/10/2013 that since the Gant test results were invalid, "we are unable to accurately assess his cognitive complaints to determine if he remains impaired from working in any capacity."

143.   That statement was and is false and incomplete.  Liberty had other means at its disposal, including the evidence previously submitted and described in this Complaint, and making a request for proof from Mr. Ellis, or allowing Mr. Ellis to submit a retest.

144.   Liberty's termination of the claim was not supported by any evidence that the cognitive impairments previously documented by Dr. Helffenstein and others, and acknowledged by Liberty's Dr. Crouch had somehow resolved or gone away.

145.   The report of Dr. Gant, for the reasons stated above, was unreliable and could not form a substantial basis for any determination as to whether or not there was proof of Mr. Ellis's disability.

146.   Purported reliance on a source that is demonstrably unreliable lacks a substantial basis and is arbitrary and capricious.

147.    The termination of Michael Ellis's Long Term Disability benefits announced in the December 10 letter was effective December 4, 2013.

148.    This termination of benefits was arbitrary and capricious.

149.    In its December 10, 2013 termination letter, Liberty made the following statement:

> "In his request for review please include the following documentation: a comprehensive Neuropsychological Examination that includes validity testing…"

No further specifications or requirements for any particular validity test were provided.

150.    Michael Ellis, through his attorney, timely submitted his administrative appeal.

151.    Michael Ellis's administrative appeal consisted of letters from counsel dated June 6, 2014, July 3, 2014 and July 9, 2014, all with attachments.

152.    The June 6, 2014 letter recounted the history of the claim and pointed out many of the flaws in Liberty's handling of the claim and much of the arbitrary and capricious conduct alleged in this Complaint.

153.    The June 6, 2014 letter pointed out, with exhibits and citations, clinical evidence that demonstrates Mr. Ellis's cognitive deficits, noting that these observations were made by multiple providers over many months, thereby making it impossible that the cognitive impairment could be faked or feigned as alleged by Dr. Gant and Liberty.

154.    The June 6, 2014 letter pointed out that Dr. Gant and Liberty had failed to address or account for any of this evidence of cognitive impairment.

155.   Attached to the June 6, 2014 letter to Liberty was a narrative report dated March 25, 2014 from Derek Cicchitto, M.S., CCC-SLP, the cognitive therapist who worked with Mr. Ellis the most at Boulder Community Hospital.   Mr. Cicchitto's letter included the following statements:

> My observations and evaluation of Mr. Ellis over many sessions demonstrate that he has cognitive deficits, most notably in the areas of attention, memory, organization, speed of cognitive processing, problem solving/reasoning, word-finding and cognitive overload.   These deficits were typically and consistently exacerbated by cognitive fatigue and lack of cognitive endurance, which was evident in the course of 50-minute sessions.   The deficits were demonstrated repeatedly over numerous sessions, exercises, formal and informal assessments and observations.   I also consistently observed significant delays in Mr. Ellis's response times.
>
> At the time of my initial evaluation, I was aware of the findings of Dennis Helffenstein, Ph.D. in his neuropsychological evaluation of Mr. Ellis.   The cognitive deficits that I observed and documented are consistent with the areas of impairment identified by Dr. Helffenstein.   Mr. Ellis's complaints and demonstrated deficits were generally consistent and involved similar areas of functioning throughout my sessions with him.   Mr. Ellis typically reported fatigue and his fatigue was evident during our 50-minute sessions throughout my work with him.   He required breaks during a 50-minute session.   Mr. Ellis's overall presentation and performance was consistent throughout my experience with him.

156.   Also attached to the June 6, 2014 letter to Liberty were two award letters from the Social Security Administration finding that Michael Ellis meets the medical requirements for disability benefits based on his claim of brain injury, cognitive deficits, possible cerebral hypoxia, leg weakness, balance problems, depression, tremors, and numbness.

157.   The June 6, 2014 letter pointed out that the Social Security Administration's standard for determination of disability is much more demanding

than the standard in the Liberty Life policy, and so Liberty Life must afford great weight to the Social Security disability determination.

158.   Also attached to the June 6, 2014 letter were the images and report of a SPECT (Single Photon Emission Computed Tomography) Scan of Michael Ellis's brain done on 5/6/2014.   The SPECT Assessment Report included the following findings:

> Impressions:
>
> This is an abnormal brain SPECT study demonstrating a diffuse, decreased, patchy cortical pattern as well as focal areas of abnormal cortical hypoperfusion in the frontal, temporal, occipital and cerebellar areas as previously described.   In addition, focal areas of abnormal subcortical hypoperfusion were noted in the pontine portion of the brainstem, the left caudate and the bilateral globus palladi as previously described.   Paradoxical cortical deactivation was noted with the concentration task.   The nature, location and pattern of these abnormalities is most consistent with the scientific literature pertaining to a diffuse, toxic/hypoxic encephalopathic process and the patient's clinical history which was received after the blind review.

159.   The June 6, 2014 letter also informed Liberty that the reading of decreased cortical activity with the concentration task was strikingly consistent with Mr. Ellis's long-standing subjective complaint that, when he is cognitively challenged, he feels like his brain is shutting down and he gets overwhelmed.

160.   The June 6, 2014 letter also enclosed numerous court opinions and medical articles demonstrating the acceptance, validity, reliability and admissibility of SPECT scans as objective evidence of impaired brain function.

161.   On July 3, 2014, in a timely fashion pursuant to agreement with Liberty Life, plaintiff's counsel submitted another letter with attachments in support of the administrative appeal.

162.   The July 3, 2014 letter attached a 23-minute video recording of Dr. Hipskind pointing out and explaining the abnormal findings on the SPECT scan images.

163.   Also included in the July 3, 2014 letter to Liberty Life was a discussion of additional information refuting the allegation by Liberty and Dr. Gant, offered by them as an explanation for Mr. Ellis's apparent cognitive deficits, that Mr. Ellis was motivated by secondary gain in claiming that he is disabled.

164.   The July 3, 2014 letter explained to Liberty that Mr. Ellis's "Basic Monthly Earnings" as defined by the policy, which are the basis for calculating LTD benefits at a rate of 60%, understated his actual earnings.   The letter demonstrated that, when Mr. Ellis's actual W-2 compensation and stock options were considered, the LTD benefits represent only 33.4 to 51.3 percent of his pre-disability compensation.  Supporting documentation was attached.

165.   In addition, the July 3, 2014 letter advised Liberty of other activities of Mr. Ellis that he has had to forego, including writing a regular newspaper column, and that this loss of activity is inconsistent with secondary gain from feigning a disability.  Supporting exhibits were attached.

166.   On July 9, 2014, also timely per agreement with Liberty Life, plaintiff's counsel submitted a letter to Liberty Life and provided a Neuropsychological Re-Evaluation report dated 7/9/2014 from Dennis A. Helffenstein, Ph.D., C.R.C.

167.   In his 7/9/2014 report, Dr. Helffenstein reviewed Mr. Ellis's observed physical symptoms and Mr. Ellis's reports of symptoms and a detailed history of ongoing physical and cognitive issues.

168.   Dr. Helffenstein reported that he had reviewed the November 20, 2013 Neuropsychological Evaluation report by Dr. Gant.   Dr. Helffenstein agreed that Mr. Ellis performed sub-optimally on a number of the symptom validity tests performed by Dr. Gant.  But Dr. Helffenstein stated:

> I would note that Mr. Ellis passed all of my stand alone symptom validity tests as well as embedded measures of symptom validity. Therefore, while Dr. Gant may doubt the validity of his testing, I have no doubt about the validity of my testing.

169.   Dr. Helffenstein also reported that, based on having seen several dozen Independent Medical Examinations by Dr. Gant, he questions Dr. Gant's assessment process and opinions.

170.   As a specific example of his concerns about Dr. Gant's testing process and conclusions, Dr. Helffenstein reported:

> In talking with Mr. Ellis about his evaluation with Dr. Gant, he recalls that Dr. Gant would not allow him to take requested breaks during the testing process.   As a result, he became extremely fatigued during the testing, a point which Dr. Gant does not acknowledge in his narrative report.   This significant fatigue alone could account for his sub optimal performance on system validity measures.

171.   Mr. Ellis's reports of fatigue while undergoing the Gant testing are consistent with Dr. Gant's acknowledgment that Mr. Ellis was "incredibly slow" in completing the testing, necessitating the request from Dr. Gant to Liberty for an additional date to complete the testing.

172.   Dr. Helffenstein reported that his May 2014 evaluation included three tests of level of effort and symptom validity.   These were tests known as the CARB, the TOMM and the Rey-II 15-Item Memory Malingering Test.   Mr. Ellis's

performance on all aspects of the symptom validity testing was well within the range of individuals found to be giving good effort.  His Reliable Digit Span Score also suggested good effort.  Based on these results, Dr. Helffenstein concluded that the May 2014 testing is an accurate and valid reflection of Mr. Ellis's neuropsychological status.

173.   Dr. Helffenstein's 7/9/14 report provides detailed reporting and analysis of Mr. Ellis's test results, including the following:

> 1.     Mildly Impaired score on the Processing Speed Index, which measures speed of visual processing.
>
> 2.     Mildly to Moderate Impaired Score on Letter-Number Sequencing, a task that requires attention and concentration and working memory.
>
> 3.     Below Average score on Digit Span, a task that required sustained attention and concentration and maintenance of information in the immediate memory.
>
> 4.     Mildly Impaired score on Symbol Search, which requires sustained visual attention and accurate visual discrimination.
>
> 5.     Below Average score on Coding, which requires sustained visual attention and concentration and maintenance of information in immediate memory.
>
> 6.     Mildly Impaired score on Visual Puzzles, a task that evaluates simple to complex visual analysis and organization.

174.   Dr. Helffenstein found that one of Mr. Ellis's index scores on the Expanded Halstead-Reitan Neuropsychological Test Battery fell in the range characteristic of individuals with acquired cerebral dysfunction.

175.   Dr. Helffenstein also reported that Mr. Ellis exhibited the following specific impairments, inconsistencies, and/or relative weaknesses:

1.      Severe Impairment of manipulative dexterity bilaterally (Grooved Pegboard);

2.      Moderate Impairment of pure motor speed bilaterally (Finger Tapping Test);

3.      Mild Impairment of strength of grip in the dominant (right) hand; and, Below Average ability in the non-dominant (left) hand (Hand Dynamometer);

4.      Mild to Moderate Impairment of learning of new rote verbal information (Buschke Verbal Selective Reminding Test [CLTR]);

5.      Mild Impairment of amount of information in memory following a 30-minute delay period (Buschke Verbal Selective Reminding Test);

6.      Below Average learning of complex nonverbal (visual) information (Modified Taylor Complex Figure Test);

7.      Below Average learning of new nonverbal (visual) information (Figure Memory Test);

8.      Mild Impairment of retention of newly-learned nonverbal (visual) information after a four hour delay (Figure Memory Test);

9.      Mild to Moderate Impairment of visual scanning speed (Digit Vigilance Test); and

10.     Below Average visual scanning accuracy (Digit Vigilance Test).

176.    Dr. Helffenstein also made the following observations:

- The degree of difference between Mr. Ellis's Verbal Comprehension Index Score and processing Speed Index Score was of a magnitude rarely seen in non-brain-injured individuals.

- When the General Ability Index Score is notably greater than the Full Scale IQ, this can be an indicator of organicity.  Mr. Ellis's GAI was 7 points greater than his Full Scale IQ, a degree of difference found in only 7.0% of the normative database.

- His subtest variability range was greater than one might expect to see in a non-brain-injured individual.

177.   Dr. Helffenstein found that Mr. Ellis continued to demonstrate several indicators of executive dysfunction.   These affected his sustained auditory attention and concentration abilities, visual sustained attention and concentration, and speed of visual processing.

178.   Dr. Helffenstein reported that Mr. Ellis's rote verbal leaning was Mildly to Moderately Impaired, his 30-minute recall was Mildly Impaired, and his Story Memory Test Learning was lower than would be expected.

179.   Dr. Helffenstein reported that Mr. Ellis had a number of specific deficits or relative weaknesses in the domain of visual short term memory.

180.   In Dr. Helffenstein's May 2014 testing, Mr. Ellis had a number of deficits or relative weaknesses in vision and visual problem solving.

181.   Dr. Helffenstein also reported that in the May 2014 testing Mr. Ellis continues to demonstrate a number of motor deficits bilaterally, which appear to link directly to his health-related problems that occurred on or around February of 2012, including:

Fine motor speed (each hand) Moderately Impaired;

Fine motor dexterity (each hand) Severely Impaired;

Grip strength in the left hand Below Average.

182.   Dr. Helffenstein concluded in his July 9, 2014 report that Mr. Ellis's cognitive deficits, inconsistencies, or relative weaknesses will have a significant negative impact on Mr. Ellis's employability and that he would likely not be able to maintain competitive employment, for reasons that include the following:

32

1.      His Global Deficit Score, a measure of generalized cognitive functioning, was Mildly Impaired at the 13th percentile.  This score suggests generalized cognitive dysfunction to the point that Mr. Ellis would likely have difficulty maintaining competitive employment in any job.

2.      His mildly impaired visual information processing speed causes him to process visual information at a very slow rate, so it will be difficult for him to perform any job that has a visual component at a competitive speed.

3.      The type of impairment in auditory and visual sustained concentration and attention that Mr. Ellis exhibited typically slows an individual's work performance to the point that they are unable to work at a competitive speed.

4.      Fading attention puts him at risk for performing any job.

5.      Mr. Ellis's deficits in verbal and visual short-term memory mean that he will be slow to learn any new jobs, and he will be at risk for making errors due to memory inefficiencies.

6.      Below average visual scanning abilities like those of Mr. Ellis typically result in clerical detail errors in one's work.

7.      Due to his motor deficits in fine motor speed, fine motor dexterity, and grip strength, he would have extreme difficulty performing any job that requires these types of motor skills.

183.   Dr. Helffenstein also cited the abnormal SPECT scan performed on Mr.

Ellis.  Dr. Helffenstein stated:

Another compelling piece of evidence that Mr. Ellis did in fact experience a neurological injury is his abnormal SPECT scan performed at CereScan in Denver, Colorado.  I now have over 100 patients that have undergone comprehensive neuropsychological evaluation with me and have also undergone brain SPECT imaging with Dr. Hipskind.  I have found that the degree of correlation between areas of low blood flow on the SPECT scan imaging and abnormalities in neuropsychological testing to be quite high.  I believe the SPECT imaging does provide compelling evidence that the source of Mr. Ellis' cognitive and other deficits do have neurological basis.

184.   Dr. Helffenstein concluded that, since 27.5 months had elapsed since the neurological event or events that caused Mr. Ellis's deficits, he has reached maximum medical improvement and his cognitive deficits are permanent.

185.   Dr. Helffenstein further concluded:

> It is my opinion as both a neuropsychologist and vocational expert that Mr. Ellis is totally and permanently disabled from competitive employment.   It is my opinion that he would be unable to successfully maintain substantial gainful work activity.

186.   Liberty Life was aware of the contents of Dr. Helffenstein's report, as outlined above, on or after July 10, 2014, and had received all of plaintiff's letters and attachments in support of his appeal by that date.

187.   On or about July 15, 2014, Liberty Life referred the claim file to a consultant, Timothy Belliveau, Ph.D. for full review.

188.   Arrangements were made to have Dr. Helffenstein's May 2014 raw data sent to Dr. Belliveau.  The raw data was received by Dr. Belliveau on or about August 25, 2014.

189.   Timothy Belliveau, Ph.D., ABPP, neuropsychologist, who identified himself as "Consultant, Liberty Mutual Insurance Company" issued a report captioned "Clinical Case Review" dated 9/17/14.

190.   On September 19, 2014, Liberty Life, in a letter bearing the name of Stephanie Berry, Appeal Review Consultant, upheld its December 10, 2013 termination of the claim and denied Mr. Ellis's administrative appeal.

191.   The only claim activity in the Liberty Life claim log/claim notes after the submission of the plaintiff's appeal, other than transmission of the raw data and

referral of the file to Dr. Belliveau, was the following, dated September 19, 2014, set out in its entirety:

```
09/19/2014 6:12 PM - CLAIM Note 168
Claim/Event/Leave: 4450623
NoteSubject : Appeal
Other Subject : OUT
Text: [09/19/2014 - BERRY, STEPHANIE]APPEAL UPHOLD. THE REVIEW OF
THE FILE AND THE ADDL INFO REC&#39;D ON APPEAL DOES NOT OFFER
FINDINGS TO ALTER THE PRIOR DETERMINATION. MAINTAIN DENIAL FOR NOT
TD AO. LETTER FAXED TO THE ATTORNEY. (FILE CONTAINS A DISK THAT WAS
SUBMITTED BY THE ATTORNEY ON APPEAL)
```

192.   The file demonstrates absolutely no consideration, analysis, response to, or rationale concerning the appeal materials by any claims personnel at Liberty Mutual.

193.   The September 19 appeal denial letter recited several provisions from the Policy, including the Mental Illness limitation and Non-Verifiable symptoms but does not purport to rely on any of these except Liberty's assertion that Mr. Ellis's medical condition does not render him disabled from any of the occupations listed in a "Transferrable Skills Analysis/Vocational Review" dated July 24, 2013.

194.   Liberty Life, in its termination letter, refers to this "vocational analysis" or "vocational review" as a necessary part of the basis of its denial of Mr. Ellis's appeal, in that Liberty claims Mr. Ellis is capable of doing any of the jobs that the vocational analysis identifies.

195.   The introductory paragraph of the Transferrable Skills Analysis/Vocational Review, upon which Liberty purports to rely, states:

> I have been asked by the Disability Case Manager to base the transferable skills analysis on a presumed full time sedentary work capacity, as defined by the Department of Labor in the DOT.  No consideration is to be given to any other specific restrictions or limitations that do not fit into the definition of sedentary work as described by the Department of Labor (e.g. positional restrictions

such as bending, squatting, upper extremity use, frequency of position changes, etc.; visual restrictions or limitations; psychiatric/psychological restrictions or limitations; or cognitive restrictions or limitations).

(Emphasis Added).

196.    Since the claimed basis of Mr. Ellis's disability is cognitive restrictions and limitations, a vocational analysis that by definition and scope does not consider cognitive restrictions and limitations is meaningless, and can provide no support whatsoever for Liberty's denial of the claim.

197.    Liberty's September 19, 2014 denial of the appeal provides a brief summary or outline of the evidence.

198.    One of the notable and important errors in Liberty's summary of the evidence is the statement that "Dr. Gant concluded that…there was no valid reliable evidence of cognitive impairment."

199.    That statement misstates and embellishes what Dr. Gant said or could say based on his evaluation.  In reality, Dr. Gant said that his testing produced no valid evidence of cognitive impairment.   Dr. Gant ignored other evidence of cognitive impairment described above, and Liberty knew this.

200.    Dr. Gant could not reasonably comment on the validity of Dr. Helffenstein's 2012 testing because Dr. Gant denied the raw data was available for his review, even though Dr. Crouch had this data months earlier.

201.    Liberty Life's own Dr. John Crouch had previously reviewed Dr. Helffenstein's 2012 raw data and determined that it was valid evidence of cognitive dysfunction that rendered Mr. Ellis disabled.

202.   The September 19, 2014 denial letter ignored and failed to address the content and implications of the narrative report from Derek Cicchitto submitted in support of Mr. Ellis's appeal.

203.   The September 19, 2014 denial letter ignored and failed to address the information submitted in support of Mr. Ellis's appeal that demonstrated the lack of a factual basis for its claim that Mr. Ellis is motivated by secondary gain.

204.   Concerning the SPECT scan, the denial letter acknowledges the substance of Dr. Hipskind's findings, and adds: "However, he noted that correlation with the patient's entire medical history was advised."   There is no support for any claim that the quoted comment diminishes the significance of Dr. Hipskind's findings.

205.   The only other reference in the denial letter to the SPECT results is the following statement, quoted from the report of Dr. Belliveau, which states:

> In regard to the SPECT procedure results, the reviewer reported that although SPECT findings can provide useful information during the evaluation of some neuropsychiatric conditions (e.g., dementia), it is important to note that scientific studies about the utility of SPECT procedures during evaluation of dementia or brain injury due to trauma may not necessarily be applied to evaluation of brain injury due to hypoxic-ischemic events, and that the cognitive and psychological assessment methods used during neuropsychological examination represent a more direct process of determining functional status.

(Emphasis Added).

206.   The quotation from Dr. Belliveau's report included in Liberty's denial letter failed to include Dr. Belliveau's next sentence: "I would defer to a consulting neurologist or radiologist's analysis if there is need for any further review of conclusions based on SPECT procedures."

207.   No such consultation by Liberty with anyone knowledgeable concerning SPECT procedures was ever obtained.

208.   The highlighted language, "may not necessarily be applicable", quoted by Liberty, has no meaning for any standard of proof known to jurisprudence. Further, that language suggests that a level of proof is required that is essentially impossible.  Such a position is without any rational or legal basis and cannot form a substantial basis for rejecting the findings from the SPECT scan.

209.   Further, as the literature and court decisions provided to Liberty indicate, SPECT scans show alterations in the blood flow or perfusion.  There is no basis for the suggestion that diminished blood flow resulting from trauma has a different functional result than diminished blood flow from hypoxia.

210.   There is no indication in the denial letter or in Dr. Belliveau's report that anyone on behalf of Liberty ever looked at the SPECT images or the video of Dr. Hipskind explaining the images.

211.   The September 19, 2014 appeal denial letter relied entirely on the report of Dr. Belliveau.

212.   Dr. Belliveau never saw or examined Mr. Ellis and never administered any tests to him.  Dr. Belliveau's report is essentially a critique and commentary on the three previous neuropsychological evaluations.

213.   Concerning Dr. Helffenstein's evaluation of August and September 2012, Dr. Bellieveau noted that methods used for cognitive performance validity assessment included the CARB, Word Memory Test (WMT), TOMM and internal performance validity indices embedded in the Digit Span subtest and the

Category Test.  Symptom validity assessment consisted of the validity indices embedded in the MMPI-2.

214.   Dr. Belliveau had no significant criticism of the CARB results.

215.   Dr. Belliveau stated that the TOMM scores indicated valid test results.

216.   Embedded validity indices on the Category Test and the Digit Span subtest indicated that Mr. Ellis' response pattern was valid.

217.   According to Dr. Belliveau, the WMT scores were classified as "Good Effort" under the automated classification used in the "old" DOS-based version of the WMT.  If the results were compared with the current WMT interpretation guidelines, one of the scores just met the minimum threshold deemed to indicate an invalid pattern of test responses.

218.   No explanation is provided for the significance of all of the passing scores in the presence of this single marginally failing score.

219.   These are the same raw data from the 2012 testing that Liberty's Dr. Crouch reviewed in 2013 and from which Dr. Crouch concluded that the results were valid.

220.   Dr. Belliveau's position is that even though Mr. Ellis passed every single validity test and embedded validity indicator administered by Dr. Helffenstein in 2014, he is critical of Dr. Helffenstein's 2014 testing because it did not include the WMT.

221.   Under Dr. Belliveau's argument, all of the other validity indicators, all of which Mr. Ellis passed in 2012 and 2014, are irrelevant and meaningless because the WMT is more sensitive.

222.   The basic premise of Dr. Belliveau's position, and the sole basis for his questioning of the validity of Dr. Helffenstein's 2014 test results, is that Dr. Helffenstein did not include the WMT in his battery of tests administered to Mr. Ellis in 2014.

223.   Dr. Belliveau essentially treats the WMT as absolutely essential and a <u>sine qua non</u> for valid neuropsychological testing where the subject is a claimant.

224.   By adopting and relying on Dr. Belliveau's position concerning the WMT, citing this position in its denial letter, and relying on this argument for the basis of its denial of Mr. Ellis's appeal, Liberty Life has also made the WMT a <u>sine qua non</u> for proof of Mr. Ellis's disability.

225.   This requirement that the WMT be used is an after-the-fact condition contrary to Liberty Life's request for proof and contrary to the opinion and input of its in-house consultant, Dr. Crouch.

226.   In his September 2013 recommendation for a neuropsychological evaluation, Dr. Crouch stated that validity indicators were necessary but stated no requirement to use the WMT.

227.   In its December 10, 2013 termination letter, Liberty Life stated:

> In his request for review please include the following documentation: a comprehensive Neuropsychological Evaluation that includes validity testing, MMPI-2-RF testing, and appropriate testing to evaluate cognitive capacity with respect to functioning in a workplace environment…

228.   Liberty Life could have, if it deemed necessary, specified inclusion of the WMT.  It did not.

229.   Shifting ground and demanding, after-the-fact, that without the WMT no neuropsychological tests would be considered valid no matter how well Mr. Ellis did on multiple other accepted validity indicators is arbitrary and capricious.

230.   Dr. Belliveau's report also discusses, but does not state any opinions or conclusions arising from, the fact that Mr. Ellis did well in some cognitive functions.   This commentary does not provide any reasonable support for denying Mr. Ellis's appeal.

231.   Dr. Belliveau also comments and provides a bar chart that even normal subjects demonstrate "impaired" scores.  No opinions or conclusions are drawn from this observation.  Neither Dr. Belliveau nor Liberty Life take the position that this data invalidates all neuropsychological testing.   This information is misleading and vexatious.

232.   Liberty Life knew that persons with debilitating cognitive impairment frequently continue to perform well on some tests and functions.  Liberty also knew that normal individuals often have some "impaired" scores, and that this does not invalidate neuropsychological testing.   This knowledge is consistent with Dr. Crouch's reviews of the claim.

233.   Liberty Life's reliance on such a consultant as Dr. Belliveau, despite these defects, is further evidence of Liberty Life's arbitrary and capricious conduct.

234.   Liberty Life's use of Dr. Belliveau and his insistence on the use of the WMT, his insinuations without opinions, and his re-scoring of the 2012 WMT contrary to Dr. Crouch's opinions, is an effort to abuse the procedural framework

of an ERISA claim and take unfair advantage of having the last word with no opportunity for rebuttal by the claimant.

235.   Such abuse of the ERISA internal review process denies the claimant a full and fair review and is arbitrary and capricious.

236.   In its denial of the administrative appeal, Liberty Life failed to address any of the points raised in the appeal, failed to address the narrative report provided by Derek Cicchitto, failed to address the SPECT scan results, and failed to address the significance of Mr. Ellis's corresponding physical neurological signs.

237.   In its denial of plaintiff's appeal, defendant Liberty Life failed to address the findings of the Social Security Administration that Mr. Ellis is disabled under the SSA's rules. Liberty's denial letter stated:

> However, an award of Social Security Benefits is not determinative of entitlement to benefits under the specific terms and conditions of the Comcast Corporation Group Disability Income Policy and our determination is based upon updated medical records and testing, and different medical and vocational reviews that would not have been considered by the SSA in December 2013.

238.   Liberty Life's response is evasive and lacks substance for the following reasons:

1.) While a Social Security Disability award is not necessarily determinative of a private LTD claim, the LTD carrier, especially where it advocates for and benefits from the SSDI award, has an obligation to consider the SSA's decision and reconcile its contrary decision;

2.) Liberty's denial is allegedly based on insufficiency of the evidence.  There is no claim that additional evidence proved Mr. Ellis was not disabled.  The fact that Liberty had additional evidence that was superfluous to the SSA's decision cannot distinguish Liberty's decision from the SSA's findings.

3.) Liberty's reference to a vocational analysis that by its own parameters ignored cognitive disabilities cannot support a decision contrary to that of the SSA.

239.   In denying the appeal without addressing the evidence and arguments presented on behalf of Mr. Ellis, the defendant Liberty Life ignored key evidence and therefore acted arbitrarily and capriciously.

240.   The defendant's actions detailed above demonstrate indicia of bad faith which support a finding of arbitrary and capricious conduct.

241.   As a result of all of the arbitrary and capricious conduct alleged herein, Liberty Life rendered decisions terminating plaintiff's LTD benefits and denying his administrative appeal that lack a substantial basis and are themselves arbitrary and capricious.

242.   Liberty Life has therefore breached its contractual obligations to the plaintiff to pay him LTD benefits under its Group Disability Income Policy No. GF3-830-502315-O1E.

243.   As a result of defendant Liberty Life's breach of contract, the plaintiff Michael Ellis has been damaged in the amount of the LTD benefit of $8,572.29 per month (less the initial monthly amount of Social Security Disability benefits actually received) for the period December 4, 2013 until the past due benefits are paid.

244.   Plaintiff Michael Ellis has exhausted his administrative remedies.

245.   By its letter of December 10, 2013, Liberty Life terminated Mr. Ellis's claim.

246.   In doing so, defendant Liberty Life has repudiated its obligations under the Policy.

247.   Plaintiff further seeks clarification of his right to future benefits pursuant to 29 U.S.C. § 1132(a)(1).   Specifically, plaintiff requests this Court to determine that:

1)   plaintiff is disabled within the meaning of the policy;

2)   plaintiff will remain entitled to monthly long term disability benefits under the terms of the Policy until September 11, 2023, unless and until there is a substantial improvement in his cognitive condition and functionality that renders him no longer disabled.

248.   As a further result of defendant Liberty Life's breach of its obligations under the Policy, the plaintiff has incurred substantial costs and attorneys' fees, and will continue to incur such costs and fees up until and throughout the entry of judgment and any post-judgment proceedings in this matter.

116.   Plaintiff therefore seeks his attorneys' fees and costs as authorized by 29 U.S.C. § 1132(g)(1).

**Wherefore**, plaintiff Michael Ellis prays this Court for relief against the defendant, Liberty Life Insurance Company of Boston, as follows:

A)   Monthly Long Term Disability benefits from December 4, 2013 until the date paid in the amount of $8,572.29 for each month, minus the specified Social Security Disability Income benefits received;

B)   Clarification that plaintiff will remain eligible to receive such monthly LTD benefits until September 11, 2023 unless and until there is material improvement in his present condition that renders him no longer disabled under the definition of Disability provided in the Policy;:

C)      Attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1);

D)      Costs pursuant to 29 U.S.C. § 1132(g);

E)      In the alternative to item D, above, costs as the prevailing party;

F)      Interest from the date benefits were denied at the rate of 8% per annum,

or to the maximum extent allowed by law; and

G)      Such other and further relief as the Court may deem appropriate.

Dated this 13th day of January, 2015.

> /s/ James A. Cederberg
> /s/  Luke M. Cederberg
> CEDERBERG LAW FIRM, P.C.
> 1200 28th St., Ste. 302
> Boulder, CO 80303
> 303-499-0449
> 303-499-0542 (Fax)
> ATTORNEYS FOR PLAINTIFF

Plaintiff's address:

1715 Columbine Ave.
Boulder, CO 80302