IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 15-cv-00090-LTB

MICHAEL D. ELLIS,

     Plaintiff,

v.

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, a New Hampshire
corporation,

     Defendant.

---

MEMORANDUM OPINION AND ORDER

---

Babcock, J.

     This ERISA case is before me for determination of the merits following

briefing by the parties.  *See* Doc #s 57, 61 & 62.  After consideration of the parties'

briefs, the record, and the case file, and for the reasons stated below, I enter

judgment in favor of Defendant Liberty Life Assurance Company of Boston

("Liberty").

## I.  Background

     Plaintiff Michael D. Ellis is a former Senior Systems Architect for Comcast

Corporation ("Comcast").  As Senior Systems Architect, Mr. Ellis's responsibilities

included (1) analyzing product requirements working with Senior Management,

Product Management, Product Design, Finance, Product Development,

Integration/Test, and Operations; (2) allocating system requirements into individual

requirements for new and existing components and interfaces; (3) analyzing feature

complexity and time estimates, negotiating with management to determine feature set to be delivered; (4) creating detailed architectural documents; (5) managing requirements database; (6) creating detailed interface documents; and (7) performing bandwidth modeling. Doc # 35-12, p.1.

In January of 2012, Mr. Ellis, now 59 years of age, became ill with pneumonia and developed severe chest pain caused by a pulmonary embolism. Doc # 35-22, p. 10. While receiving emergency medical treatment for his chest pain on February 1, 2012, Mr. Ellis went into cardiac arrest and his heart stopped beating for a period of 24 seconds. *Id.* Several weeks later, Mr. Ellis reported diminished concentration, dizziness, and feeling weak and wobbly. Doc # 35-21, p. 24-5. Mr. Ellis's last day of work for Comcast was February 29, 2012, and he was awarded SSDI benefits from the Social Security Administration ("SSA") beginning in August of 2012 based on his claim of disability due to brain injury, cognitive deficits, possible cerebral hypoxia, leg weakness, balance problems, depression, tremors, and numbness. Doc # 33-12, pp. 9 & 11-15.

As a Comcast employee, Mr. Ellis was eligible to participate in Liberty's Group Disability Income Policy GF3-830-502315-01 (the "Policy"). Mr. Ellis was a Class 4 employee for purposes of coverages under the Policy. Mr. Ellis's claim for short term disability benefits, payable by Comcast pursuant to its Short Term Disability Plan, was first approved as of March 1, 2012. Liberty, as the administrator of Comcast's Short Term Disability Plan ultimately extended Mr. Ellis's short term disability benefits to the maximum period of September 5, 2012.

## A. Mr. Ellis's Medical Records

Mr. Ellis received physical and speech-language therapy. Notes from Mr. Ellis's physical therapy sessions dated in 2012 reflect that Mr. Ellis was experiencing weakness, fatigue, and loss of balance/coordination. *See e.g.* Doc # 34-14, p. 9. Notes from Mr. Ellis's speech therapy sessions in 2012 and 2013 reflect that Mr. Ellis was experiencing mild to moderate cognitive deficits in areas including attention, memory, and complex reasoning. *See e.g.* Doc #34-15, p. 22.

Dennis A. Helffenstein, Ph.D., performed a neuropsychological examination of Mr. Ellis in August and September of 2012. Doc # 35-6, pp. 7-22. In a report dated November 10, 2012, Dr. Helffenstein detailed cognitive deficits he observed in Mr. Ellis and opined that these deficits "relate directly and solely to the medical event that occurred on February 1, 2012" and that it "seems reasonable that an episode of cerebral hypoxia did occur during this event." *Id.* at p. 19. Dr. Helffenstein concluded that due to a combination of his "physical, fatigue, visual, cognitive, and emotional coping problems," Mr. Ellis was totally disabled from competitive employment at that time. *Id.* at p. 21.

Daniel C. Hadley, M.D., Mr. Ellis's primary care physician who had been treating him since February of 2012, completed a restrictions form for Liberty on May 23, 2013 and stated that Mr. Ellis was unable to participate indefinitely in any work situation requiring a minimal amount of concentration for more than 10 - 20 minutes due to "cognitive impairment from hypoxic encephalopothy." Doc # 34-16, p. 21. Alan Zacharias, a neurologist who began treating Mr. Ellis in May of 2012,

also completed a restrictions form for Liberty on May 25, 2013 and stated that Mr. Ellis was unable to work as shown by neuropsychological testing and his notes. Doc # 34-16, p. 11.

On August 12, 2013, Dr. Hadley answered Liberty's request for specific activities restrictions/limitations and recommended that in an 8-hour workday Mr. Ellis could sit for 1-1½ hours at a time for a cumulative total of over 5½ hours; stand and walk for a cumulative total of 2½ hours; push, pull, lift, and carry up to 20 pounds for short distances for a cumulative total of 2½ hours; and was restricted in climbing, squatting, bending, and kneeling due to dizziness. Doc # 34-12, pp. 11-13. Dr. Hadley also noted that Mr. Ellis "continues to have cognitive impairment resulting in ongoing disability related to concentration/memory." *Id.* at p. 13.

On May 16, 2014, Mr. Ellis was seen for a high-resolution brain SPECT imaging study. S. Gregory Hipskind, M.D. Ph.D., reported that the results of the study were abnormal and that the abnormalities "were most consistent with the scientific literature pertaining to a diffuse, toxic/hypoxic encephalopathic process and the patient's clinical history." Doc # 34-7, pp. 22-4.

## B. Liberty's Policy

The Policy provides that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of the policy and benefit eligibility shall be conclusive and binding." Doc # 52, p. 42.

In pertinent part, the Policy defines "Disability" or "Disabled" for purposes of

long term disability as follows:

> i. if the Covered Person is eligible for the 12 Month Own Occupation
> Benefit, "Disabled" or "Disability" means that during the Elimination
> Period and the next 12 months of Disability the Covered Person, as a
> result of Injury or Sickness, is unable to perform the Material and
> Substantial Duties of his Own Occupation; and
>
> ii. thereafter, the Covered Person is unable to perform, with reasonable
> continuity, the Material and Substantial Duties of Any Occupation.

*Id.* at p. 9. Under the Policy,

> **"Own Occupation"** means the Covered Person's occupation that he was
> performing when his Disability or Partial Disability began. If the
> Covered Person is unable to earn 80% of his predisability earnings he
> will be considered unable to perform his Own Occupation. For
> purposes of determining Disability under the policy, Liberty will
> consider the Covered Person's occupation as it is normally performed
> in the national economy.
>
> **"Any Occupation**," with respect to Class 4, means any gainful
> occupation that the Covered Person is or becomes reasonably fitted by
> training, education, experience, age, physical and mental capacity.
> Gainful occupation means an occupation in which the earnings are:
>
> -equal to or greater than 80% of the Employee's pre-disability income;
>
> -less than 80 % of the Employee's average pre-disability income, but
> higher than the average earnings for the geographic area in which the
> Employee resides; or
>
> - equal to or greater than the gross benefit.

*Id.* at pp. 7 & 12.

The Policy provides that payment of long term disability benefits will cease

on the earliest of

> 1. the date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;
>
> ...
>
> 8. The date the Covered Person s no longer Disabled according to this Policy;
>
> ...

*Id.* at pp. 34-5. The Policy also contains a Mental Illness, Substance Abuse and/or Non-Verifiable Symptoms Limitation (the "Mental Illness provision") which provides that the benefit for disability due to any of these conditions will not exceed a period of 24 months. *Id.* at p. 26.

## C. Liberty's Handling of Mr. Ellis's Claim for Long Term Disability Benefits

By letter dated January 21, 2013, Liberty advised Mr. Ellis that he would be receiving long term disability benefits under a reservation of rights while it conducted a medical review to determine his eligibility. Doc # 35-4, p. 22.

Liberty had Dr. John A. Crouch, a neuropsychologist affiliated with Liberty's Clinical Services Department, and Dr. Gilbert Wager, a doctor of internal medicine, pulmonary medicine and critical care medicine, review Mr. Ellis's medical records. Dr. Wager stated that an assessment of Mr. Ellis's reported neuropsychological impairments was outside the scope of his expertise but opined that from a physical perspective Mr. Ellis appeared able to perform sedentary work on a full time, sustained basis. Dec # 35-5, p. 9. After reviewing Dr. Helffenstein's raw data, Dr. Crouch set forth the following findings in a report dated April 4, 2013:

> ...various statistically and clinically significant impairments are revealed across multiple neurocognitive domains including learning/memory, attention/concentration, and processing speed.

> A variety of significant restrictions and limitations would likely result from this claimant's impairment including difficulty with concentration, persistence, pace, and adaptation. Given the reportedly cognitively demanding nature of [Mr. Ellis's] job, he would likely be precluded from performing the usual duties of the job, regardless of accommodations provided.
>
> ... the likelihood that his 2/1/12 reported 24-second period of asystole is the sole cause of his functional difficulties is highly unlikely. Although findings from measures of emotional/psychological functioning suggest a possible psychiatric contribution, other possible contributors remain unclear. Given this lack of diagnostic clarity, [Mr. Ellis's] prognosis for possible future RTW remains unclear.

Doc # 35-4, p.4.

By letter dated April 11, 2013, Liberty notified Mr. Ellis that "[a]lthough the etiology of your cognitive deficits is unclear at this time, we have determined you are disabled from cognitive deficits and are eligible to receive LTD benefits." Doc # 35-3, p. 22. By this letter, Liberty also advised Mr. Ellis that both of its medical reviewers indicated that it was highly unlikely that 24-second period of asystole was the cause of his impairments and that its reviewing neuropsychologist identified a possible psychiatric component to his cognitive deficits. *Id.* at pp. 21 - 22. Based on the latter, Liberty further notified Mr. Ellis and that his claim for long term disability benefits was subject to the Mental Illness provision of the Policy. *Id.* at p. 22. Liberty identified Mr. Ellis's date of disability as March 1, 2012 and determined that he was entitled to receive benefits (after the elimination period) as of September 6, 2012. *Id.*

In response to this letter, Mr. Ellis provided Liberty with a letter from Dr. Helffenstein in which he expressed his agreement with Liberty's reviewing doctors'

opinions that it was highly unlikely that the 24-second period of asystole Mr. Ellis experienced on February 1, 2012 was the cause of his cognitive impairments. Doc # 34-12, pp. 1-2. Dr. Helffenstein stated that Mr. Ellis's cognitive dysfunction "most likely relates to a more extended period of cerebral hypoxia." *Id.* at p. 1. Dr. Helffenstein further stated that he had no indication "that depression or any other psychiatric issue was contributing to [Mr. Ellis's] cognitive dysfunction identified by [his] testing" and that Liberty would be making a grievous error if it limited Mr. Ellis's disability benefits under the Policy's Mental Illness provision "as absolutely no part of his cognitive dysfunction relates to a mental illness." *Id.* at pp. 1-2.

Following a request for clarification by Mr. Ellis, Liberty, by letter dated August 26, 2013, explained that Mr. Ellis was approved for long term disability benefits but because "the etiology of Mr. Ellis's cognitive impairments remains unclear and a psychiatric condition has been noted as a contributing condition," the Policy's Mental Illness provision had been applied and was running concurrently as Liberty continued to evaluate Mr. Ellis's claim. Doc # 34-11, pp. 23-24. Liberty further advised that it was evaluating whether Mr. Ellis could perform any alternative occupations since the Policy definition of "Disability" changed after twelve months of benefits. *Id.* at p. 24.

A Transferrable Skills Analysis/Vocational Review ("TSA/VR") dated July 24, 2013 was performed on behalf of Liberty. The Vocational Case Manager indicated that she based her report on a presumed full time sedentary work capacity and that she did not include any cognitive and/or mental restrictions and limitations. Doc #

8

34-13, pp. 10-11.  The Vocational Case Manager identified software engineer, project director/manager, computer systems engineer, and computer information & systems manager as occupations that Mr. Ellis could perform.  *Id.* at p. 13.

In September of 2013, Liberty again referred the case to Dr. Crouch and asked him to provide an updated assessment of Mr. Ellis's ability to perform alternate occupations.  Doc # 34-11, p. 11.  Dr. Crouch responded, in part, that he found it "unlikely that the claimant could perform the job duties of alternate occupations comparable to his prior job."  *Id.*

Dr. Bob L. Gant performed neuropsychological testing of Mr. Ellis on behalf of Liberty in October of 2013 and reported his results as "invalid."  Doc # 34-10, p. 8. Dr. Gant opined as follows:

> ...it is my determination that within reasonable medical probability the patient has not suffered cognitive impairment related to the asystole event which lasted 24 seconds on February 1, 2012.  In fact, I am not certain that the patient suffers from cognitive impairment.  It is likely that elements of secondary gain and/or impairment related to somatic exaggeration is responsible for [Mr. Ellis's] presentation. During this examination, Mr. Ellis displayed evidence of symptom exaggeration and poor effort within the context of a disability examination.

*Id.* at p. 11.  Dr. Gant reviewed Dr. Helffenstein's November 10, 2012 report and concluded that "inadequate testing was done [by Dr. Helffenstein] to evaluate patient effort and test validity."  *Id.* at p. 3. Dr. Gant further opined about Dr. Helffenstein's testing:

> ... the performance validity tests utilized by Dr. Helffenstein ... are considered inadequate by current standards ... for assessing a patient referred within the context of a disability assessment with unequivocal evidence of secondary gain ....  Several of the tests discussed by Dr.

Helffenstein are no longer published and Dr. Helffenstein did not
appear to utilize the most current version of the available tests for
assessing secondary gain issues and poor effort.

*Id.* Dr. Gant indicated that he would be happy to confirm or amend his opinions if

provided with additional information, including Dr. Helffenstein's raw data. Doc #

34-9, p. 23.

By letter dated December 10, 2013, Liberty advised Mr. Ellis that long term

disability benefits would no longer be paid to him after December 3, 2013. Doc # 34-

9, pp. 11-16. By way of explanation, Liberty stated that Mr. Ellis's failure to put

forth valid and reliable effort at the neuropsychological testing performed by Dr.

Gant left Liberty "unable to accurately assess his cognitive complaints to determine

if he remains impaired from working in any capacity." *Id.* at p. 15. Liberty also

noted Mr. Ellis's subjective complaints of fatigue and dizziness but stated that there

was no indication from any treatment provider that these symptoms were causing

impairment to Mr. Ellis or that these symptoms required continued restrictions and

limitations that would prevent Mr. Ellis from performing the duties of Any

Occupation. *Id.*

Mr. Ellis appealed Liberty's termination of his long term disability benefits.

Doc #s 34-5, pp. 13-16 & 34-7 pp. 1-12. In connection with his appeal, Mr. Ellis

provided Liberty with the report from his neuropsychological re-evaluation

performed by Dr. Helffenstein in March of 2014. Doc # 33-6, p. 21 - Doc # 33-7, p.

10. Therein, Dr. Helffenstein noted that Mr. Ellis had shown improvement in some

areas of testing but had reached maximum medical improvement such that all

10

remaining cognitive deficits were to be considered permanent. Doc # 33-7, pp. 9-10.

Dr. Helffenstein ultimately concluded that Mr. Ellis was totally and permanently

disabled from competitive employment and further opined as follows:

> ... Mr. Ellis experienced a 24-second period of asystole (i.e., cardiac
> standstill). It is obvious that such a brief period of cardiac standstill
> would not be expected to result in any significant cerebral hypoxia.
> However, Mr. Ellis did experience some type of neurological event
> during this timeframe.
>
> Based on my re-evaluation with Mr. Ellis, I am even more convinced
> that he did experience some type of neurological event (likely a hypoxic
> episode or episodes) during the early part of February of 2012 related
> to his various medical conditions. ... I am not sure that any physician
> or neuropsychologist could point to a specific time or event that
> resulted in Mr. Ellis's neurological injury but, at this point, I am
> absolutely convinced that such an injury did occur.

Doc # 33-6, pp. 21-22 & Doc # 33-7, p. 9.

Mr. Ellis also provided Liberty with a letter from his speech-language

therapist who indicated that his "observations and evaluations of Mr. Ellis over

many sessions demonstrate that he has cognitive deficits, most notably in the areas

of attention, memory, organization, speed of cognitive processing, problem-

solving/reasoning, word-finding and cognitive overload." Doc # 33-12, p. 8. Mr.

Ellis's therapist further indicated that his observations were consistent with the

areas of impairment identified by Dr. Helffenstein. *Id.*

Liberty referred Mr. Ellis's claim to Dr. Timothy Belliveau, Ph.D., for review.

Dr. Belliveau summarized Mr. Ellis's medical records and provided a detailed

analysis of the three neuropsychological evaluations. Doc # 33-3, p. 3 - 33-4, p. 1.

Dr. Bellivaeu concluded that the records provided insufficient support "for the

presence of cognitive or psychologically-based impairment that would necessitate occupational restrictions or limitations" and "for the presence of cognitive impairment attributed to hypoxic-ischemic encephalopathy." Doc # 33-3, pp. 5-6.

By letter dated September 19, 2014, Liberty advised Mr. Ellis that his medical condition "is not of a nature and severity that would preclude him from performing the material and substantial duties of the alternative occupations identified as being within his functional capacity and vocational skills" and that Liberty was therefore maintaining its decision to deny continued long term disability benefits to him beginning December 4, 2013. Doc # 33-2, p. 20 - 33-3 p.1.

## II. Standard of Review

While Liberty captioned its brief as a Combined Response Brief and Motion for Summary Judgment in an ERISA Case [*see* Doc # 61], it concedes that Fed. R. Civ. P. 56 standards are not applicable in ERISA cases. Instead, I act as an appellate court and evaluate the reasonableness of Liberty's decision based on the evidence contained in the administrative record. *Panther v. Synthes,* 380 F. Supp. 2d 1198, 1207 n. 9 (D. Kan. 2005).

"'[A] denial of benefits' covered by ERISA 'is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan,* 605 F.3d 789, 796 (10th Cir. 2010) (*quoting Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)). Where the plan gives the

administrator such discretionary authority "[courts] employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Id.* (*quoting Weber v. GE Group Life Assur. Co.,* 541 F.3d 1002, 1010 (10th Cir. 2008)).

The Policy expressly gives Liberty discretion to construe its terms and to determine benefit eligibility. Mr. Ellis argues that I should nonetheless employ a de novo standard of review because the applicable provision of the Policy is void pursuant to C.R.S. § 10-3-1116(2) which states as follows:

> An insurance policy, insurance contract, or plan that is issued in this state that offers health or disability benefits shall not contain a provision purporting to reserve discretion to the insurer, plan administrator, or claim administrator to interpret the terms of the policy, contract, or plan or to determine eligibility for benefits.

For § 10-3-1116(2) to be applicable, I must first determine if this case is subject to Colorado law. Liberty argues that this case is governed by Pennsylvania law because the Policy so expressly provides and the Policy was issued to Comcast there. In response, Mr. Ellis argues that the Policy was in fact issued to him as a Comcast employee in Colorado and that Liberty has failed to cite any authority to support the argument that it can exempt itself from Colorado's statutory insurance regulations by electing to be governed by the laws of another state. I agree with Mr. Ellis.

Contracting parties may choose the law to govern their relations "unless there is no reasonable basis for their choice or unless applying the law of the state so chosen would be contrary to the fundamental policy of a state whose law would

13

otherwise govern." *Hansen v. GAB Bus. Servs., Inc.,* 876 P.2d 112, 113 (Colo. App. 1994) (*citing Restatement (Second) of Conflict of Laws* § 187 (1971)).  Colorado has an express public policy of regulating insurance to promote the public welfare.  *See* C.R.S. § 10-1-101.  § 10-3-1116(2) was enacted in furtherance of this policy. Because there is no comparable statutory provision under Pennsylvania law, applying Pennsylvania law here would be contrary to a fundamental policy of the State of Colorado.  Having failed to cite any authority to show otherwise, Liberty's argument based on the Policy's choice-of-law provision must fail.  *See LaAsmar*, 605 F.3d at 796 (party arguing for more deferential arbitrary and capricious standard of review bears the burden of establishing that it should be applied).  I further conclude that the Policy was issued in Colorado for purposes of § 10-3-1116(2).  *See Shafer v. Metro. Life Ins. Co.,* 80 F. Supp. 3d 1244, 1250-51 (D. Colo. 2015) (policy issued to corporate employer out-of-state but then issued to claimant in Colorado was issued in Colorado for purposes of §10-3-1116(3)).

Liberty also argues that § 10-3-1116(2) is not applicable in this case because it is preempted by ERISA.  This issue has not been addressed by the Tenth Circuit but another judge of this Court considered this question in *McClenahan v. Metro. Life Ins. Co.,* 621 F. Supp. 2d 1135 (D. Colo. 2009), and concluded that § 10-3-1116(2) is not preempted by ERISA.  I agree with and adopt the preemption analysis in *McClenahan*.  I further note that the only authority cited by Liberty in support of its preemption argument is distinguishable because there the court considered whether § 10-3-1116(3), not §10-3-1116(2), was preempted by ERISA.

*See Shafer*, 80 F. Supp. 3d at 1251-57. *See also* C.R.S. § 10-3-1116(6) (providing that provisions of § 10-3-1116 are severable).

Finally, Liberty argues that § 10-3-1116(2) does not apply in this case because the statute is not retroactive. *See McClenahan v. Metro. Life Ins. Co.,* 416 Fed. Appx. 693, 696 (10th Cir. 2011). This argument is predicated on the fact that the Policy was issued in 2005, prior to the enactment of §10-3-1116(2) in 2008. In response, Mr. Ellis argues that because relevant events, including renewals and amendments to the Policy and his disability claim, occurred after the 2008 enactment of § 10-3-1116(2), application of this statute would not be retroactive. I agree with Liberty that application of § 10-3-1116(2) in this case would be retroactive and therefore improper.

Two other judges of this Court have considered the question of whether § 10-3-1116(2) can be applied to policies renewed after its effective date and both concluded that it could not though by different reasoning. *See Johnson v. Life Ins. Co. of North Amer.,* 2017 WL 1154027 at *11-*13 (D. Colo. Mar. 28, 2017); *Mustain-Wood v. Nw. Mut. Life Ins. Co.,* 938 F. Supp. 2d 1081,1085 (D. Colo. 2013). I am persuaded by the reasoning in *Johnson* that the Colorado Legislature's failure to expressly state that § 10-3-1116(2) would apply to insurance policies renewed after its effective date despite having done so with respect to other statutes was an intentional omission that precluded the prospective application of § 10-3-1116(2) based on policy renewals. Mr. Ellis's remaining argument that application of § 10-3-1116(2) in this case would not be retroactive because all of the events giving rise

to his disability claim occurred well after the statute's effective date is also unavailing. Because § 10-3-1116(2) prohibits the inclusion of certain discretionary authority provisions in insurance policies, the applicable date for retroactivity analysis must necessarily relate directly to the policy at issue. *Compare Kisselman v. Amer. Family Mut. Ins. Co.,* 292 P.3d 964, 975-6 (Colo. App. 2011)(provisions of §§ 10-3-1115 & 1116 that prohibit acts of unreasonable delay or denial of payment of benefits can be violated by insurer's post-effective date conduct regardless of when claim for benefits was made).

Consistent with the terms of the Policy then, I apply the arbitrary and capricious standard of review. Under this standard, my "review is limited to determining whether the interpretation of the plan was reasonable and made in good faith." *Kellogg v. Metro. Life Ins. Co.,* 549 F.3d 818, 826 (10th Cir. 2008) (internal quotations omitted). A benefits decision will be upheld unless it is not grounded on *any* reasonable basis. *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (citation omitted). The decision need not be the only logical one nor even the best one so long as it falls somewhere on a continuum of reasonableness - even if on the low end. *Id.* Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary. *Caldwell v. Life Ins. Co. of N. Amer.,* 287 F.3d 1276, 1282 (10th Cir. 2002). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the decision. *Rekstad v. U.S. Bancorp,* 451 F.3d 1114, 1119-20 (10th Cir. 2006).

An inherent conflict of interest arises when the entity that determines eligibility for benefits is the same entity that pays the benefits. *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 111-15 (2008). When such a conflict of interest exists as it does here, the benefits decision is still subject to the arbitrary and capricious standard of review but the conflict is weighed as a factor in determining whether there is an abuse of discretion. *Id.* at 115-16.

## III. Analysis

The question presented by this appeal is whether Liberty's decision to deny Mr. Ellis long term disability benefits under the Policy's "Any Occupation" provision was reasonable. Under the arbitrary and capricious standard of review applicable to this case, I conclude that it was and therefore enter judgment in favor or Liberty for the reasons set forth below.

Preliminarily, Mr. Ellis argues that Liberty's handling of his claim for long term disability benefits became arbitrary and capricious beginning in April of 2013 when it took the position that Mr. Ellis's claim was subject to the Policy's Mental Illness provision and questioned the causal connection between the 24-second period of cardiac arrest and Mr. Ellis's cognitive deficits. Mr. Ellis acknowledges, however, that Liberty continued to pay benefits for several months after April of 2013. Moreover, Liberty's ultimate decision to terminate Mr. Ellis's long term disability benefits was not based on either the Policy' Mental Illness provision or a lack of causation but rather because Mr. Ellis did not meet the Policy's definition of disability under the Policy's "Any Occupation" provision after December 3, 2013.

17

Doc # 34-9, p. 15. I therefore attach little significance to Liberty's reference to these considerations in its correspondence in April of 2013 or in subsequent correspondence.

As for Liberty's decision to terminate his long term disability benefits, Mr. Ellis makes several arguments to undermine the neuropsychological evaluation performed at Liberty's request by Dr. Gant. First, Mr. Ellis argues that Liberty's reliance on Dr. Gant's evaluation was not reasonable because Dr. Gant failed to comply with Dr. Crouch's specifications for what should be included in a neuropsychological re-evaluation of Mr. Ellis. Doc # 34-11, p. 11-12. Specifically, Mr. Ellis asserts that Dr. Gant failed to discuss Mr. Ellis's background, work accomplishments, earnings, activities, and physical issues and failed to obtain information from a collateral source regarding Mr. Ellis's functioning prior and subsequent to his alleged impairment. Dr. Crouch, however, reviewed Dr. Gant's report and did not note these purported deficiencies. Dr. Belliveau, who reviewed Dr. Gant's report in connection with Mr. Ellis's appeal, likewise did not identify comparable deficiencies in Dr. Gant's report.

Next, Mr. Ellis argues that Liberty's reliance on Dr. Gant's report was arbitrary and capricious because Dr. Gant did not review Dr. Helffenstein's raw data. That Dr. Gant's evaluation was meant to be independent undermines this argument. Since Dr. Gant expressed a willingness to review this data, it may have nonetheless been preferable for Liberty to provide it to him but its failure to do so was not unreasonable particularly since Dr. Helffenstein's raw data was provided to

18

Drs. Crouch and Belliveau who, unlike Dr. Gant, did not have the benefit of their own firsthand observations or conduct their own testing of Mr. Ellis.

Mr. Ellis also argues that Dr. Gant's report fails to reconcile his own observations of Mr. Ellis with his conclusion that there was insufficient evidence that Mr. Ellis suffered from a cognitive impairment. Dr. Gant's ultimately concluded that Mr. Ellis "displayed evidence of symptom exaggeration and poor effort" during his evaluation. Doc # 39-9, p. 22. While Mr. Ellis clearly disagrees with this conclusion, it is obvious that Dr. Gant attached greater significance to the results of symptom validity tests administered to Mr. Ellis than to his observations, and no further explanation was warranted.

Mr. Ellis faults Dr. Gant, and more generally Liberty, for ignoring "voluminous" evidence from his treating physicians and therapists. However, Drs. Gant, Crouch, Wager, and Belliveau all discuss Mr. Ellis's medical records at some length. This consideration of his medical records contradicts Mr. Ellis's attempt to characterize Liberty's treatment of the evidence in this case as "cherry-picking." Under ERISA, Liberty was not required to accord special weight to the opinions of Mr. Ellis's treatment providers nor did it bear the burden of explaining why it credited other reliable evidence that arguably conflicted with these opinions. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003). In many cases, however, the records simply reflect Mr. Ellis's subjective reporting of his condition. *See e.g.* Doc # 35-13, p. 1038. For all of these reasons, I find no reversible error in

Liberty's treatment of the records from Mr. Ellis's treating physicians and therapists.

Mr. Ellis also argues that Liberty's review of its decision to terminate Mr. Ellis's long term disability benefits was arbitrary and capricious based on claims notes that show little activity on Mr. Ellis's claim other than referring it to Dr. Belliveau for review. In light of the detailed letter Liberty sent regarding its review of Mr. Ellis's claim and the thorough report prepared by Dr. Belliveau, there is no basis for me to conclude that Liberty failed to give due consideration to Mr. Ellis's appeal. The fact that Dr. Belliveau is affiliated with Liberty does not alter this conclusion. By the same token, it is noted that Dr. Helffenstein, on whose opinions Mr. Ellis repeatedly relies, was retained by his counsel.

Turning to the substance of Liberty's September 19, 2014 letter denying continued long term disability benefits, Mr. Ellis first asserts that Liberty mis-characterized Dr. Gant's otherwise flawed report. *See* Opening Brief, p. 77. The distinctions Mr. Ellis attempts to make between Liberty's characterization of Dr. Gant's report and the report itself, however, are inconsequential; the fact remains that Dr. Gant disputed the results of Dr. Helffenstein's first neuropsychological evaluation of Mr. Ellis and questioned whether Mr. Ellis suffered from any cognitive impairment.

Next, Mr. Ellis challenges Liberty's purported failure to account for Mr. Ellis's abnormal SPECT study as evidenced in its letter denying Mr. Ellis's appeal. Liberty accurately summarized the conclusions of this study, including its

statement that "[h]owever, [Dr. Hipskind] noted that correlation with [Mr. Ellis's] entire medical history is advised." Mr. Ellis argues that the advised correlation was provided by Dr. Helffenstein and his brief in this appeal. However, as also referenced in Liberty's September 2014 letter, Dr. Belliveau opined that the scientific studies supportive of SPECT studies related to evaluating dementia or brain injury to trauma and may not be applicable to evaluating brain injury due to hypoxic-ischemic events and that neuropsychological evaluations were a more direct way to assess functional status. Doc # 33-4, p. 7. Although Mr. Ellis takes issue with this opinion, his unsupported argument fails to demonstrate that it is categorically unreasonable. While Dr. Belliveau went on to say that he would defer to a consulting neurologist or radiologist's analysis if there was a need for further review of the SPECT study, Liberty's failure to seek further review of the study, while arguably preferable, was not arbitrary and capricious in light of the neuropsychological evaluations available to it.

Mr. Ellis argues that another portion of Dr. Belliveau's report cited by Liberty is confusing and/or irrelevant. *See* Opening Brief, p. 80. This argument has merit yet the quoted language has little significance in the context of Liberty's ultimate decision on Mr. Ellis's claim for continued long term disability benefits. Indeed, Mr. Ellis identifies other conclusions in Dr. Belliveau's report concerning validity test results as "the opinion that is at the crux of the case:" *See* Opening Brief, p. 81. Liberty accurately summarized this conclusion as follows:

> The reviewer notes that Mr. Ellis passed the tests for validity in the 2014 exam with relatively lower sensitivity; but, he had previously failed the tests with relative higher sensitivity during the 2012 and 2013 exams; and his passing on the performance of the most sensitive cognitive performance validity test in 2012, is actually a failure by current test interpretation standards.

Doc # 33-2, p. 25. *See also* Doc # 33-3, pp. 17-19.

Mr. Ellis argues Dr. Belliveau's did not adequately explain his conclusion regarding Mr. Ellis's performance on the most sensitive validity test administered in 2012, *i.e.*, the Word Memory Test ("WMT"), but this argument does not warrant a finding that Liberty acted unreasonably in relying on this expert conclusion which was supported by some explanation though not to the degree propounded by Mr. Elis. Additionally, Dr. Gant similarly concluded that Dr. Helffenstein did not appear to utilize the most current version of tests to assess issues of secondary gain and poor effort. Doc # 34-10, p. 3. Mr. Ellis continues to focus on the WMT throughout the remainder of his argument about Dr. Bellivau's validity testing conclusions when in fact Mr. Ellis had invalid results on other tests in 2013 and showed signs of symptom over-reporting/exaggeration in 2012 and 2013. Doc # 33-3, pp. 13, 15-16.

Mr. Ellis also argues that Liberty's denial letter demonstrates that it acted unreasonably because of its reliance on the TSA/VR to demonstrate Mr. Ellis's work capabilities when this analysis did not consider any cognitive impairments or restrictions. This approach, however, is entirely consistent with Liberty's position

that Mr. Ellis did have a demonstrable cognitive impairment that affected his ability to perform full time sedentary work.

Lastly, Mr. Ellis argues that Liberty acted unreasonably in failing to consider the SSA's determination that he was disabled and entitled to benefits. The relevant evidence in the record does not allow for my review of the context of or basis for the SSA's determination of disability. *See* Doc # 33-12, pp. 9 & 11-15 & Doc # 34-8, pp. 13-18. There is therefore no basis for me to conclude that Liberty's contrary determination was arbitrary and capricious or to reject Liberty's assertion that its decision to terminate Mr. Ellis's may well have been based on information not available to the SSA at the time of its decision.

While reasonable minds might differ on the question of Mr. Ellis's entitlement to continued long term disability benefits under the Policy, I conclude that the decision by Liberty to terminate those benefits it is not subject to reversal under the arbitrary and capricious standard of review applicable here even after taking Liberty's conflict of interest is taken into account. *See Nance v. Sun Life Assur. Co. of Canada,* 294 F.3d 1263, 1269 (10th Cir. 2002) (arbitrary and capricious standard is "a difficult one for a claimant to overcome"). It is not surprising that in a 90 page brief Mr. Ellis was able to identify some issues with Liberty's handling of his claim for continued long term disability benefits. However, based on the record before me, these issues, viewed both separately and cumulatively, do not render Liberty's ultimate decision to deny Mr. Ellis continuing

long term disability benefits under the Policy's "Any Occupation" provision unreasonable.

## IV. Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED that judgment is entered in favor of Liberty, and this case is DISMISSED WITH PREJUDICE.

Dated: September __18__, 2018.

<div style="margin-left: 40%;">

BY THE COURT:

__s/Lewis T. Babcock_____
Lewis T. Babcock, Judge

</div>